**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| SKYDIVE ARIZONA, INC., | ) | Case No. CV 05-2656-PHX-MHM |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| CARY QUATTROCCHI; BEN BUTLER; USSO, LLC d/b/a 1800SKYRIDE; ATLANTA SC, INC.; CASC INC.; IGOVINCENT, INC.; a Georgia Corporation; 1800SKYRIDE.COM; DOES 1-50, | ) | |
| Defendants. | ) | |
| And Related Counterclaims and Third-Party Claims. | ) | |

Currently pending before the Court is Plaintiff Skydive Arizona, Inc.'s ("Plaintiff") Motion in Limine to Exclude the Testimony of John T. Durkin. (Dkt. #289). After reviewing the pleadings and hearing argument on May 20 and July 17, 2009, the Court issues the following order.

**I.  BACKGROUND**

In their counterclaim against Plaintiff, Defendants allege that Plaintiff engaged in unfair competition and interfered with Defendants' contractual relationships (and business expectancies) with independent drop zone operators within Defendants' nation-

wide "network" of drop zones. (Dkt. #174, ¶¶ 32-53). To that end, Defendants offer John Durkin as an expert witness to testify that (1) Plaintiff's alleged conduct[1] (1) "could have resulted in a substantial reduction in [Defendants'] network size"; (2) "USSO's skydiving drop zone network size fell when Plaintiff's actions began, while there was no change in USSO's balloon network size"; and (3) "[t]he reduction in network size reduced USSO profit by $1,961,622." (Dkt. #288, Exh. 1, p.4). Plaintiff now moves the Court to exclude Mr. Durkin's testimony under Rules 402, 403, 702, and 703 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993).

Plaintiff asserts that Mr. Durkin's opinions are not based on sufficient facts or data, and are not the product of reliable principles or methods; that Mr. Durkin did not apply scientific principles and methods reliably to the facts of the case; and that his testimony is neither relevant nor helpful to the jury, is misleading, and is based on facts that are inherently incorrect.[2] (Dkt. #289). Defendants respond by noting that Plaintiff does not appear to be challenging Mr. Durkin's qualifications, but instead appears to confuse the credibility and accuracy of Mr. Durkin's opinion with its reliability and relevancy. (Dkt. #302). To that end, the jury is free to give Mr. Durkin's opinion little or

---

[1] Plaintiff's alleged conduct is (a) making false and disparaging statements about Defendants and (b) encouraging drop zone operators to cease doing business with Defendants. (Dkt. #174, ¶¶ 33, 39, 48).

[2] Plaintiff also challenges Mr. Durkin's damage calculation. Specifically, Plaintiff argues that Mr. Durkin's conclusion that a reduction in Defendants' network size equals loss in profits is incorrect because despite the loss of any specific drop zone operator, Defendants would have made profit off skydivers as long as Defendants' network included other drop zone operators in the vicinity. Although that argument may have merit, the Court notes that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. More importantly, Plaintiff raised this argument for the first time at the very end of the July 17, 2009 Final Pretrial Conference; and thus Defendants have not had a chance to respond. Accordingly, the Court will not take up this issue at this time.

1 | no weight, and to credit instead Plaintiff's attacks on Mr. Durkin's testimony and report.
2 | (Id.).

## II.  LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. It is the trial court's obligation to act as a "gatekeeper" to admission of expert testimony under Rule 702. Daubert, 509 U.S. at 597. Proffered expert testimony must "rest[ ] on a reliable foundation and [be] relevant to the task at hand." Id. There are four non-exclusive factors to consider in determining whether expert testimony is reliable: (1) whether the scientific theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. Id. at 593-94. In addition, a "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) ("Daubert II").

The test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively apply to all experts or in every case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999). As such, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys when making its ultimate reliability determination. Id. at 151-54. In addition to reliability, trial courts "must ensure that the proposed expert testimony is 'relevant to the task at hand,' . . . i.e., that it logically advances a material aspect of the proposing party's case." Daubert II, 43

F.3d at 1315. Defendants bear the burden of demonstrating that their expert's testimony is reliable and will assist the trier of fact in resolving a disputed issue of material fact. Id. at 1316.

## III. DISCUSSION

### A. Reliability

As a general matter, "[t]he test for reliability focuses on the expert's 'principles and methodology, not on the conclusions that they generate.'" IMA North America, Inc. v. Maryln Nutraceuticals, Inc., 2008 WL 4628404, at *3 (D. Ariz. 2008) (quoting Daubert, 509 U.S. at 594-95). But Plaintiff does not challenge Mr. Durkin's qualifications or raise any of the specific factors enumerated in Daubert. Instead, Plaintiff argues that Mr. Durkin's opinions are unreliable because they were developed for the purpose of testifying.

There is no question that Mr. Durkin's conclusions are tailored to the facts of this case. But there is also nothing wrong with such conclusions as long as there is "proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.'" Daubert II, 43 F.3d at 1317. In other words, the issue is whether the expert's underlying *research or theories* on which she bases her conclusions were developed for purposes of testifying, not whether the expert's *conclusions* were developed for purposes of testifying. Here, there is no evidence that Mr. Durkin developed any of the economic theories on which he bases his conclusions expressly for the purpose of testifying. Those theories are well-established; he simply explains them in his report and then applies them to a hypothetical set of facts.

Mr. Durkin's testimony appears to "be supported by appropriate validation – i.e., good grounds, based on what is known." Daubert, 509 U.S. at 590. The principles and methodologies discussed by Mr. Durkin are general economic principles on networks and network effects. Therefore, the Court is satisfied that Mr. Durkin's testimony rests on a reliable foundation.

### B. Relevance

Plaintiff questions the relevance of the network externalities theory in the context of Defendants' network of drop zone operators. Specifically, Plaintiff argues that "a critical prerequisite for the application of [the] [network externalities] theory is that you have a network that generates matches between buyers and sellers, and specifically sellers who have the attributes that the buyer seeks," but "[t]hat is not the kind of network that we have in this case": "here a buyer is being deceived into thinking they are getting matched up with the attributes that they are looking for because they are told that they are doing business with Skydive Scottsdale or whatever, when there is no skydiving drop zone located there . . . ." (Dkt. #311, pp. 49-50). Plaintiff also contends "[t]here is no relationship between the number of drop zones in the network and the amount of profits that [Defendants]] make . . . ." (Id., p.52).

In markets characterized by network externalities or network effects, "'the utility that a user derives from consumption of the good increases with the number of other agents consuming the good.'" United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) ("Microsoft II") (quoting Michael L. Katz & Carl Shapiro, Network Externalities, Competition, and Compatibility, 75 Am. Econ. Rev. 424 (1985)). "For example, '[a]n individual consumer's demand to use (and hence her benefit from) the telephone network . . . increases with the number of other users on the network whom she can call or from whom she can receive calls.'" Id. (quoting Howard A. Shelanski & J. Gregory Sidak, Antitrust Divestiture in Network Industries, 68 U. Chi. L. Rev. 1, 8 (2001). Similarly, here it appears that "skydivers (buyers of services) are better off when more [drop zone operators] (sellers of services) join [Defendants'] network, and [drop zone operators] that join the network are better off when more skydivers use the network." Durkin Report, ¶ 10 (Dkt. #284). Simply put, Mr. Durkin appears to opine that because Defendants' network allegedly matches skydivers with drop zone operators, the utility of the network for both skydivers and drop zone operators increases as others join.

The utility derived from Defendants' network, contrary to Plaintiff's contention, does not appear to be necessarily diminished by the fact that Defendants deceived at least some skydivers into believing they were getting matched with particular drop zone operators in specific locations when those drop zone operators were in fact located elsewhere. A skydiver who purchases a skydive from Defendants, even if for a particular location that is not in fact within Defendants' network, is likely better off when more drop zone operators are in Defendants' network, because the skydiving locations available to the skydiver increase.[3] Likewise, drop zone operators that join Defendants' network are likely better off when more skydivers purchasing skydives from Defendants, regardless of whether any particular skydiver is deceived into thinking he or she is purchasing a skydive for a particular location (such deception may in fact be more beneficial to the drop zone operators in the network, as skydivers informed of the drop zone's actual location might not purchase the skydive). Therefore, the Court is not convinced at this time that the relevancy of network effects or externalities with respect to Defendants' network of drop zone operators is dependant on the specific knowledge, or lack thereof, of any particular skydiver.

### C. Fed.R.Evid. 703

Plaintiff argues that Mr. Durkin's testimony should be excluded because there is no evidence that Plaintiff was the *sole* cause of the reduction in Defendants' network. (Dkt. #289, pp. 4-11). Specifically Plaintiff contends that Mr. Durkin failed to take into account "numerous other events and actions that discouraged drop zone operators from being a part of Defendants' network, and which were causes of the alleged harm." (Dkt. #289, p.4).

---

[3]The fact that skydivers may be unaware of the network, and instead may be deceived into thinking that they are purchasing a skydive for a specific location and from a specific company, see Dkt. #262, pp. 41-47, means only that skydivers unaware of the benefit they receive when more drop zone operators join the network; but that does not necessarily mean that they receive no utility from the network.

- 6 -

To that end, Plaintiff points out that Mr. Durkin stated in his deposition that his "report does not attempt to determine the causes of individual members' decision to drop out of the network" (Dkt. #289, Exh. 2) and analogizes this case to Best Western Int'l v. Furber, 2008 U.S. Dist. LEXIS 70552 (D. Ariz. 2008). But Best Western is in apposite. In Best Western, the court granted summary judgment in the defendants' favor because the plaintiff failed to present an expert on the issue of causation or otherwise establish that increased terminations were caused by the defendants' conduct. Here, on the other hand, Mr. Durkin explicitly states in his expert report that he was asked to assume that Plaintiff "encouraged other [drop zone operators] not to do business with [Defendant]" and that "these actions have reduced the number of [drop zone operators] in [Defendants'] network . . . ." Durkin Report, ¶ 7. Thus, Mr. Durkin is not being presented as an expert witness to establish the initial causation;[4] and Defendants must establish through alternate means that Plaintiff did in fact cause at least some drop zone operators to cease doing business with Defendant. Best Western, 2008 WL 4182827, at *14 ("[Plaintiff] must show a 'reasonable connection' between Defendants' conduct and [Defendants'] loss of members."). But that does not mean that Mr. Durkin's testimony that Plaintiff's alleged conduct in encouraging some drop zone operators to leave Defendants' network "could have" resulted in a greater reduction of Defendants' network is inadmissible. See U.S. v. Rahm, 993 F.2d 1405, 1412 (9th Cir. 1993) ("[U]se of the conditional 'could' in expressing [a] conclusion is neither unusual nor disqualifying as to [one's] testimony . . . . It is the rare expert who is willing to opine conclusively about a past occurrence."); see also Friend v. Time Mfg. Co., 422 F.Supp.2d 1079, 1083 (D. Ariz. 2005) (same). Mr. Durkin's conclusion appears to be based on a simple hypothetical: If Plaintiff encouraged

---

[4]Mr. Durkin's testimony both assumes an element of causation and opines on an element of causation: assuming Plaintiff's actions caused some drop zone operators to leave Defendants' network, then network externalities imply that Defendants' network would become less valuable and other drop zone operators might also leave Defendants' network (and likewise, additional drop zone operators might not join Defendants' network). Durkin Report, ¶¶ 11-12, 19.

some drop zone operators to leave Defendants' network, could that lead to a substantial reduction in the network. To which Mr. Durkin, based on his report, will likely respond, "Yes, it could."

In particular, Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed.R.Evid. 703. "It is well established that an expert may answer questions based on facts offered in the form of a hypothetical question." United States v. Yagman, 2007 WL 4532670, at *11 (C.D. Cal. 2007); see Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) ("[T]he use of leading, hypothetical questions to elicit expert opinions is entirely appropriate.") (citing Fed.R.Evid. 703); see also Estate of Carey by Carey v. Hy-Temp Mfg., Inc., 929 F.2d 1229, 1235 n.2 (9th Cir. 1991) ("[E]xpert witnesses may be competent to give opinions based upon hypothetical facts even though a foundation that the expert has personal knowledge of those facts has not been laid.") (citing Fed.R.Evid. 703).

Nonetheless, "[hypothetical] questions must be based on facts in the record." Yagman, 2007 WL 4532670, at *11 (citing United States v. Celestine, 510 F.2d 457, 460 (9th Cir. 1975)); accord Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3rd Cir. 2002) ("It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record."); Guillory v. Domtar Industries, Inc., 95 F.3d 1320, 1114 (5th Cir. 1996) ("[N]othing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong.") (citation omitted); Iconco v. Jensen Const. Co., 622 F.2d 1291, 1301 (8th Cir. 1980) ("A hypothetical should include only such facts as are supported by the evidence."); Vermont Food Industries, Inc.

v. Ralston Purina Co., 514 F.2d 456, 463 (2d Cir. 1975) ("In asking a hypothetical question, the examiner may seek the witness's opinion on any combination of facts within the tendency of the evidence."); Logsdon v. Baker, 517 F.2d 174, 175 (D.C. Cir. 1975) ("An expert can give his opinion on the basis of hypothetical facts, but those facts must be established by independent evidence properly introduced."); Mueller & Kirkpatrick, FEDERAL EVIDENCE § 356 (2d ed. 2006) ("[Hypothetical] questions are proper if there is enough evidence to support a finding that the necessary facts exist and that the facts themselves suffice to support the opinion that the question seeks. But unsupported factual hypotheses should be stricken, and the question itself must be disallowed if critical elements drop away."). In addition, "the facts in the hypothetical question must be supported by the record before the question may be asked." Yagman, 2007 WL 4532670, at *11 (citing Norland v. Washington General Hospital, 461 F.2d 694, 698 (8th Cir. 1972)). Thus, Mr. Durkin can answer hypothetical questions regarding network effects on drop zone operators provided the questions are based on facts supported by evidence in the record at the time he testifies.

To the extent that Plaintiff complains that such hypotheticals and resulting conclusions fail to take into account a variety of reasons for why drop zone operators might cease doing business with Defendants, "[Plaintiff] can, through cross-examination, expose to the jury the asserted deficiencies of the hypothetical question as asked. It is for this reason that it is usually held that defects in such a question go not to the competency of the evidence, but merely affect its weight." Standard Oil Co. of Cal. v. Moore, 251 F.2d 188, 220 (9th Cir. 1958) (citations omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. Accordingly, the jury is free to give Mr. Durkin's opinion little or no weight and to credit instead Plaintiff's attacks on the opinion and the hypothetical on which it is based. See In re Scrap Metal Antitrust Litigation, 527 F.3d 517, 531 (6th Cir. 2008)

1     **D.     Fed.R.Evid. 403**

2           Even under <u>Daubert</u>, the Court must still weigh the balancing factors of Federal

3    Rule of Evidence 403. Specifically, Rule 403 permits the exclusion of relevant evidence

4    "if its probative value is substantially outweighed by the danger of unfair prejudice,

5    confusion of the issues, or misleading the jury . . . ." <u>Daubert</u>, 509 U.S. at 595; <u>see also</u>

6    <u>United States v. Dukagjini</u>, 326 F.3d 45, 58 (2d Cir. 2002) ("[E]ven if the testimony is

7    admissible under Rule 702, it still must pass muster under Rule 403: its probative value

8    must not be substantially outweighed by unfair prejudice.").

9           Plaintiff asserts that "[i]t would be prejudicial and unfair to allow [Mr.] Durkin to

10   testify that [Plaintiff] is solely responsible for the alleged decrease in the size of the

11   purported 'network' of drop zones with whom [Defendants] claim[ ] to have contractual

12   relationships . . . ." (Dkt. #289, p.14). Perhaps, but as stated above Mr. Durkin does not

13   testify that Plaintiff was solely responsible for the reduction in Defendants' network; he

14   concludes only "that the alleged acts could have resulted in a substantial reduction in

15   network size." Durkin Report, ¶ 4(a). As with the propriety of hypothetical questions,

16   whether Mr. Durkin's testimony may result in unfair prejudice or mislead the jury under

17   Federal Rule of Evidence 403 depends on whether Defendants present the necessary

18   factual foundation in the record for the assumptions on which Mr. Durkin's conclusions

19   are based. <u>See</u> <u>Elcock v. Kmart Corporation</u>, 233 F.3d 734, 756 (3rd Cir. 2000)

20   ("Permitting [an expert] to offer an opinion unsupported by a sufficient factual foundation

21   would significantly increase the risk of misleading the jury and confusing the issues, the

22   very dangers against which Rule 403 defends."). The Court cannot conclude at this time

23   that Mr. Durkin's testimony should be excluded as unfairly prejudicial under Federal

24   Rule of Evidence 403.

25   / / /

26

27

28

1     **Accordingly,**

2     **IT IS HEREBY ORDERED** denying Plaintiff's Motion in Limine No. 1. (Dkt.
3 #289).

4     DATED this 12th day of August, 2009.

_____
Mary H. Murguia
United States District Judge